UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY ILEY,

       PLAINTIFF,

v.                                                         Case No. 2:05-CV-71273

METROPOLITAN LIFE INSURANCE                Honorable Sean F. Cox
COMPANY and THE KROGER CO.
HEALTH AND WELFARE PLAN,

       DEFENDANTS.

_____/

**<u>OPINION & ORDER</u>**

      In this action, Plaintiff Kelly Iley ("Plaintiff") challenges the decision of Defendant

Metropolitan Life Insurance Company ("MetLife")[1] to terminate her long-term disability benefits

under a plan offered by her employer, the Kroger Company.  This Court's subject matter

jurisdiction over this case rests upon Plaintiff's claim for benefits under the Kroger Co. Health

and Welfare Plan, an employee welfare benefit plan governed by the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.*  Presently before the Court are

the parties' cross-motions to affirm or reverse Defendant MetLife's decision to terminate

Plaintiff's long-term disability benefits.  The parties' cross-motions have been fully briefed and

are ready for decision.  Upon reviewing the parties' briefs and the administrative record, the

Court finds that the issues have been adequately presented in these materials and that oral

_____

      [1]The Kroger Co. Health and Welfare Plan was initially named as a defendant in this
action, but was dismissed by stipulation of the parties on July 7, 2005.

argument would not significantly aid the decisional process.  *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  The Court will therefore render a decision based upon the administrative record and the parties' briefs, following the guidelines set forth in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998).[2]  For the reasons set forth below, the Court shall grant Plaintiff's motion seeking to reverse MetLife's benefit determination and shall deny Defendants' cross-motion.

## I.    FINDINGS OF FACT

In 1999 Plaintiff was employed by Kroger Company as a pharmacist.  As a Kroger employee, Plaintiff participated in the Kroger Co. Health and Welfare Plan, which includes a long-term disability plan ("the Plan").   Under this Plan, benefits are paid in accordance with the terms of a group long-term disability insurance policy issued by Defendant MetLife to Defendant Kroger Co. Health and Welfare Plan, and claims for benefits are administered by MetLife.

The Pertinent Plan Provisions.

Several provisions of the Plan are relevant for purposes of this motion.  The Plan defines "disability," in pertinent part, as follows:

**Definition of Disability**

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1.      during your Elimination Period and the next 24 month

---

[2]In *Wilkins*, the Sixth Circuit held that neither summary judgment nor a bench trial provides an appropriate procedural basis for resolving ERISA actions to recover benefits. Rather, district courts should review challenged benefit denials based solely upon the administrative record, and should render findings of fact and conclusions of law accordingly.  *Id*. at 619.

period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

2.      after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(Administrative Record "AR" at 14).

The Plan further provides that monthly benefits will end on the earliest of the following

dates:

1.  the end of the Maximum Benefit Duration;
2. the end of the period specified in the Limitation for Disabilities Due to Particular Conditions;
3.  the date you are no longer Disabled;
4.  the date you fail to provide us with any of the information listed in Plan Highlights under Benefits Checklist;
5.  the day you die;
6.  the date you cease or refuse to participate in a Rehabilitation Program as described in Work Incentive; or
7.  the date you fail to attend a medical examination requested by us as described in Medical Examination.

(AR at 6).

The section titled "Limitation For Disabilities Due to Particular Conditions" provides that

"Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a:"

Neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:

a.      seropositive arthritis;
b.      spinal tumors, malignancy, or vascular malformations;
c.      radiculopathies;

3

       d.       myelopathies;
       e.       traumatic spinal cord necrosis; or
       f.       musculopathies.

(AR at 15). The term "Radiculopathies" is defined as "Disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology." (*Id.*).

With respect to documentation to be submitted by a claimant, the Plan's section titled "Plan Highlights," states that:

> In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of the following documents. These are explained in this Certificate. Initial submission of these documents should be made no later than the 12th week following your original date of disability.
> ✓      Proof of Disability.
> ✓      Evidence of Continuing Disability.
> ✓      Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability.
> ✓      Information about Other Income Benefits.
> ✓      Any other material information related to your Disability which may be requested by us.

(AR at 11). The Plan further states that "[a]t your expense, you must provide proof of your Disability. Proof includes, but is not limited to: 1. the date your Disability started; 2. the cause of your Disability; and 3. the prognosis of your Disability." (AR at 19). It further states that "[y]ou will be required to provide signed authorizations for us to obtain and release medical and financial information, and any other items we may reasonably require in support of your Disability." (AR at 19). The Plan also expressly reserves the right to have an independent medical examination: "We will have the right to have you examined at reasonable intervals by medical specialists of our choice." (AR at 20).

The Plan also provides as follows:

4

## Discretionary Authority of Plan Administrator
## and Other Plan Fiduciaries

> In carrying out their respective responsibilities under the Plan, the Plan
> administrator and other Plan fiduciaries shall have discretionary authority to
> interpret the terms of the Plan and to determine eligibility for and entitlement to
> Plan benefits in accordance with the terms of the Plan.  Any interpretation or
> determination made pursuant to such discretionary authority shall be given full
> force and effect, unless it can be shown that the interpretation or determination
> was arbitrary and capricious.

(AR at 38).

The Plan states that claims are to be submitted to MetLife and that after a claim is

submitted, MetLife will review it and notify the claimant of its decision.  (AR at 37).  It also

states that "[i]f MetLife denies your claim in whole or in part, the notification of the claims

decision will state the reason why your claim was denied and reference the specific Plan

provision(s) on which the denial is based.  If the claim is denied because MetLife did not receive

sufficient information, the claims decision will describe the additional information needed and

explain why such information is needed."  (*Id.*).

As to appealing an initial determination by MetLife, the Plan states that MetLife will

conduct a full and fair review of the claim and that the "[i]f the initial denial is based in whole or

in part on a medical judgment, MetLife will consult with a health care professional with

appropriate training and experience in the field of medicine involved in the medical judgment."

(AR at 38).

Plaintiff's Long-Term Disability Claim.

On August 17, 1999, Plaintiff suffered an acute lumbosacral strain while bending over to

pick up a towel.  (AR at 200).  Plaintiff sought treatment from her family physician, Dr.

5

Frederick Michael but her condition continued to deteriorate. Plaintiff's condition prompted Dr. Michael to diagnose her with lumbar disc disease on June 8, 2001. (AR at 474). On July 3, 2001, Plaintiff required a discectomy to repair a herniated disc at the L5-S1 level in her back. (*Id*.). She also had an "L5-S1 decompression, stabilization and fusion on May 17, 2002, and underwent facet nerve blocks. (*Id*.).

Despite her treatment and surgeries, Plaintiff continued to have severe and limiting pain requiring her to be on "persistent narcotics," including Vicodin and she also continued to require facet nerve blocks following her surgeries. (AR at 339-342, 361). At least two consulting physicians concluded that following her surgeries Plaintiff was left with "failed back syndrome." (AR 217).

Plaintiff last worked for Kroger on May 3, 2001, and ultimately sought long-term disability benefits in November of 2001. In support of Plaintiff's claim, Dr. Randy Gehring, M.D., a board certified neurosurgeon, completed an Attending Physician Statement. (AR at 814-15). Dr. Gehring noted that Plaintiff had a "Herniated L5-S1 disc" and that she had undergone a Right L5-S1 discectomy on July 3, 2001 and that she was unable to work. (*Id*.).

The Administrative Record also contains numerous other medical records from Plaintiff's treating physicians, including a June 27, 2001 report from Dr. Gehring that states, in pertinent part:

> Diagnostic Data: MRI study of the lumber spine was done at the Macomb Unit on 02/22/01. That study disclosed evidence of single-level disc dehydration at L5-S1, with a very slight loss of disc height. Additionally, there is a central and right-sided disc herniation with displacement of the right S1 nerve root.

(AR 378). The report further noted that Plaintiff had "right S1 radicular pain, with a herniated

6

disc at the L5-S1 level."  (AR 379).

Plaintiff's claim was approved by MetLife and she began receiving long-term disability benefits effective November 11, 2001, following the completion of the elimination period mandated in the Plan.

Social Security Administration Determination.

In November 2001, Plaintiff also filed for Social Security disability benefits at the direction of plan administrators, who steered Plaintiff to a law firm that specializes in obtaining disability benefits.  (AR at 800 & 824-25).  The Social Security Administration initially denied Plaintiff's claim (AR at 805), but an administrative law judge eventually issued a decision on April 14, 2003, finding that Plaintiff was totally disabled[3] as of February 4, 2001, and was entitled to benefits as of that date.  (AR at 108-111).  As a result, MetLife demanded reimbursement for its overpayment of benefits, based on the amount of Plaintiff's awarded Social Security benefits, and collected $11,384,46 from Plaintiff in June, 2003.  (AR at 725-726 & 729-33).

MetLife's Termination Of Benefits.

On October 13, 2003, MetLife wrote Plaintiff a letter regarding her long-term disability benefits.  (AR at 712).  That letter stated that:

> Your claim for long-term disability benefits is currently approved because you are totally disabled from performing your duties as a Pharmacist.
>
> Your employer's plan states:
> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental

---

[3]The Administrative Law Judge found that Plaintiff was "unable to perform her past relevant work," and that she is "unable to do sustained work activities in an ordinary work setting on a regular and continuing basis."  (AR at 110).

injury, you are receiving Appropriate Care and Treatment from a Doctor on a
continuing basis; and

1.    during your elimination period and the next 24 month period, you are
unable to earn more than 80% of your Predisability Earnings or Indexed
Perdisability Earnings at your Own Occupation for any employer in your
Local Economy; or
2.    after the 24 month period, you are unable to earn more than 60% of your
Indexed Predisability earnings from any employer in your Local Economy
at any gainful occupation for which you are reasonably qualified taking
into account your training, education, experience, and Predisability
Earnings.

. . . .

Your disability benefits began on November 11, 2001.  For benefits to continue
beyond November 11, 2003, you must be totally disabled from performing any
Job or Occupation.

The following forms must be completed and returned to our office by November
7, 2003:
•    Attending Physician Statement (fully completed by your current treating
physician)
•    Medical Authorization
•    Training, Education, and Experience Statement
•    Activities of Daily Living

We will notify you when we have reached a decision concerning your continued
eligibility for benefits.

(AR at 719-20).  MetLife's October 13, 2003 letter to Plaintiff made no reference to the 24-

month limitation for disabilities for particular conditions and did not reference the provision on

Neuromusculoskeletal and soft tissue disorders or any of the exceptions to the 24-month

limitation.

On November 3, 2003, Dr. Gehring submitted an Attending Physician Statement to

MetLife in which he stated a primary diagnosis of "Herniated L5-S1 disc with radiculopathy."

(*See* Defs.' 10/31/05 Br. at 6; AR at 687-89).  That statement noted that Plaintiff had a L5-S1

8

discectomy on July 3, 2001 and a L5-S1 fusion on May 14, 2002.

On November 11, 2003, MetLife sent Plaintiff another letter concerning her claim for continued long-term disability benefits. (AR at 667-68). In that letter, MetLife stated that it was "currently evaluating [Plaintiff's] claim for continued Long Term Disability benefits," and advised Plaintiff that "[a]t this time your benefits will continue beyond November 11, 2003." (*Id.*). The letter stated that "for benefits to continue beyond November 11, 2003, you must be totally disabled from performing any Job or Occupation. We are currently in the process of evaluating your claim at the Any Occupation Level. We will notify you as soon as a final decision is made on your claim." Like the October 13, 2003 letter, this letter made no reference to the 24-month limitation for disabilities for particular conditions.

On July 8, 2004, MetLife sent Plaintiff a letter advising her that it was terminating her long-term disability benefits effective July 10, 2004. (AR at 498-99). MetLife's July 8, 2004 letter, for the first time ever, referenced the 24-month limitation relating to Neuromusculoskeletal and soft tissue disorders. The letter stated, in pertinent part:

> According to the facts of your claim, your disabling condition is a Neuromusculoskeletal Disorder. As a result, Monthly Benefits should have been payable for a maximum of 24 months. Your benefit start date was November 11, 2001 and your maximum duration date should have been November 10, 2003. As you are aware, benefits have continued beyond November 10, 2003.
>
> On May 25, 2004, MetLife requested that you submit updated copies of your medical records from your treating physicians. You provided this information and a **Nurse Co-Ordinator** [sic] reviewed the records upon receipt. Because your disability is a Neuromusculoskeletal Disorder and **the records have not revealed the existence of any of the exceptions listed** in the Kroger Co. LTD plan, your claim for LTD benefits has been terminated effective July 10, 2004. At this time, benefits have been issued through July 10, 2004 and no further benefits are payable.

(AR at 498-99)(emphasis added).

Plaintiff then appealed MetLife's decision to terminate her long-term disability benefits. In connection with her appeal, Plaintiff submitted additional and duplicative documents, including physician statements from Dr. Michael (a board certified internal medicine physician), Dr. Gerhing (a board certified neurosurgeon), and Dr. Rudy Vervaeke (a board certified internal medicine physician), who all conclude that Plaintiff is completely disabled from all full-time employment.  (AR 474-478, 483).  Plaintiff noted that, contrary to MetLife's July 8, 2004 letter terminating her benefits, numerous medical records in her file indicated that she had radiculopathies.  Plaintiff also asked MetLife to advise her if there were any additional records that it required from her.  (AR 486).

MetLife sent Plaintiff a letter dated January 18, 2005, in which it upheld its earlier decision to terminate her long-term benefits.  (AR 91-93).  MetLife stated that:

> In an effort to provide Ms. Iley with a full and fair review, we had her entire claim file reviewed by a Health Care Professional.  The reviewer stated that it is indeed possible that Ms. Iley is completely and permanently disabled for all employment based on the medical information.  However, after review of Ms. Iley's entire claim file, including the information submitted on appeal the reviewer found no evidence to support any of the exclusionary diagnoses for the limited benefits condition.

(AR 92).  MetLife noted that "[t]here are three physician statements from Dr. Michael dated December 20, 2004, Dr. Vervaeke dated December 27, 2004 and Dr. Gehring dated December 23, 2004 all attesting to Ms. Iley's complete disability and inability to perform any employment."  (AR 93).  MetLife further stated that

> The reviewer concluded by stating that based on the above mentioned medical information and all other medical documentation submitted in support of Ms. Iley's long term disability claim, there was no substantiation that she has any

10

condition, not limited by plan provision to 24 months of benefits that would prevent her from working.

Review of the information that has been submitted on appeal, along with the information on record, does not support a disability supported by objective documentation for a medical condition which is considered an exception under the Kroger Company's Plan.  Therefore, Ms. Iley can not be considered disabled as defined by the Kroger Company's Plan beyond July 10, 2004, and the original claim determination was appropriate.

(AR at 93).

MetLife's Diary Review Report.

Plaintiff filed this action on March 31, 2005.  In connection with this action, the entire

Administrative Record, including MetLife's internal system notes, the "Diary Review Report,"

was submitted to the Court.  Notably, MetLife's Diary Review Report states that:

**On 11/03/03 Dr. Gehring completed APS noting diagnosis of Radiculopathy and also noted that not only did EE have persistent back but also leg pain** . . . **electrodiagnostic workups have been supplied supporting Dx of radiculopathy.**

(AR at 72)(emphasis added).

## II.   CONCLUSION OF LAW

A.   Standards Governing The Cross-Motions.

A beneficiary of an ERISA qualified plan may bring suit in federal district court to

recover benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  A district court

reviews *de novo* a denial of benefits challenged under this provision, unless the benefit plan

confers upon the administrator the discretionary authority to determine eligibility for benefits or

to construe the terms of the plan, in which case the more deferential "arbitrary and capricious"

standard applies.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Glenn v.*

11

*Metropolitan Life Insurance Company,* __ F.3d __, 2006 WL 2519293, at *5 (6th Cir. 2006).

Here, the arbitrary and capricious standard is appropriate because the Plan granted the plan administrator discretionary authority to interpret the terms of the plan and to determine benefits. (AR at 38).

Under the arbitrary and capricious standard, MetLife's decision will be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn, supra* (citing *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). The arbitrary and capricious standard does not require courts to merely rubber stamp the administrator's decision. Instead, courts are called upon to review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003).

In addition, in this case MetLife decides whether a claim is eligible for benefits and MetLife pays those benefits. "This dual function creates an apparent conflict of interest." *Glenn, supra*. The Sixth Circuit has recognized that an actual conflict of interest exists when an insurer both decides whether an employee is eligible for benefits and pays those benefits. *Id*. If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in reviewing the decision at issue. *Firestone Tire & Rubber Co.*, 489 U.S. 101, 115 (1989). Because a conflict of interest exists here, the Court will consider this factor when applying the arbitrary and capricious standard.

B.    MetLife's Decision to Terminate Plaintiff's Long-Term Disability Benefits was Arbitrary and Capricious.

Even when it is reviewed under the more deferential arbitrary and capricious standard

12

applicable to this case, MetLife's decision to terminate Plaintiff's long-term disability benefits cannot be sustained. For a number of reasons, the Court finds that MetLife's benefits determination was not based on a reasoned or rational reading of the record before it.

The Plan for which Plaintiff applied covered two distinct stages of "disability." The first provided that a participant was disabled when she was "unable to earn more than 80% of [her] Predisability Earnings or Indexed Predisability Earnings at [her] Own Occupation for any employer in [her] Local Economy." (AR at 14). The second category become relevant after the first 24 months of benefits and, as interpreted by MetLife, requires that the participant be "totally disabled from performing any Job or Occupation." (AR at 14 & 668). The Plan also provides that long-term disability benefits are "limited to 24 months" during a participant's lifetime if the participant is disabled due to" a neuromusculoskeletal disorder "unless the Disability has objective evidence" of "radiculopathies." (AR at 15).

MetLife initially approved Plaintiff's claim for long-term disability benefits. After Plaintiff had received benefits for 24 months, MetLife advised Plaintiff that it was evaluating her claim for continued long-term disability benefits. In letters dated October 13, 2003 and November 11, 2003, MetLife advised Plaintiff that it was reviewing her file in order to determine if she was totally disabled from performing any job or occupation.

MetLife's decision to terminate Plaintiff's benefits, however, was not based upon a determination that Plaintiff was totally disabled from performing any job or occupation. Rather, MetLife's July 8, 2004 letter terminated Plaintiff's benefits on another ground entirely – the 24

13

month lifetime limitation for disabilities due to particular conditions.[4]  MetLife terminated

Plaintiff's benefits because it determined that her disability is a neurosmusculoskeletal disorder

and because the nurse who reviewed her claim determined that the records had not revealed the

existence of any of the exceptions listed in the Plan.

It is undisputed, however, that on November 3, 2003, Dr. Gehring submitted an Attending

Physician Statement to MetLife in which he stated **a primary diagnosis of radiculopathy**.  (*See*

Defs.' 10/31/05 Br. at 6; AR at 687-89).  Thus, in stating that the records did not reveal "the

existence" of any of the exceptions to the 24 month lifetime limitation for disabilities due to

particular conditions, MetLife entirely ignored the November 3, 2003 statement from Dr.

Gehring that diagnosed her with radiculopathy – one of the enumerated exceptions listed in the

Plan.

Plaintiff then appealed MetLife's decision and submitted numerous documents, including

physician statements from three physicians who all concluded that Plaintiff is completely

disabled from all full-time employment.  Plaintiff also noted that MetLife's decision was contrary

to numerous medical records in her file and asked MetLife to advise her if there were any

_____

[4]Notably, MetLife did not terminate Plaintiff's long-term disability benefits because it concluded that she was not totally disabled from any job or occupation.  Rather, MetLife's decision was based solely on it's conclusion that Plaintiff did come within the exception to the limitation on disabilities due to particular conditions.  Indeed, MetLife noted that three of Plaintiff's physicians concluded that Plaintiff was totally disabled from any job, and MetLife did not dispute that conclusion.  Rather, MetLife agreed that "it is indeed possible that Ms. Iley is completely and permanently disabled for all employment based on the medical information." (AR 92).  Moreover, any such determination by MetLife would have been arbitrary and capricious, given that the Social Security Administration determined that Plaintiff was totally disabled.  *See Glenn, supra* at \*7 (stating that a plan administrator's decision denying disability benefits where the Social Security Administration has determined that the applicant was totally disabled can be considered arbitrary and capricious.)

additional records that it required from her.

Plaintiff's file was then reviewed by an unidentified "healthcare professional" at MetLife. MetLife claims that the healthcare professional that reviewed Plaintiff's file for the appeal was a "nurse consultant."  MetLife's January 18, 2005 letter acknowledged that:

> On December 23, 2004 Dr. Randy Gehring, Neurosurgeon stated that as of June 27, 2001 Ms. Iley's primary diagnosis was herniated L5-S1 disc with radiculopathy, degenerative L5-S1 disc disease with subjective symptoms of back and leg pain which markedly limited her activities.  It was his opinion that Ms. Iley is completely disabled from any and all full-time employment.

Nevertheless, MetLife's January 18, 2005  letter to Plaintiff stated that the reviewer concluded that, based on all the medical documentation, "there was no substantiation that [Plaintiff] has any condition, not limited by plan provision to 24 months of benefits that would prevent her from working."  It further stated that the information on record does not support a disability supported by "objective documentation" for a medical condition which is considered an exception.

MetLife's conclusion that there was *no objective documentation* for a medical condition that is considered an exception, such as ridiculopathies, does not square with the administrative record.  That conclusion ignored Dr. Gehring's June 27, 2001 report that stated:

> Diagnostic Data: MRI study of the lumber spine was done at the Macomb Unit on 02/22/01.  That study disclosed evidence of single-level disc dehydration at L5-S1, with a very slight loss of disc height.  Additionally, there is a central and right-sided disc herniation with displacement of the right S1 nerve root.

(AR at 378).  That report further noted that Plaintiff had "right S1 radicular pain, with a herniated disc at the L5-S1 level."  (AR at 379).

In concluding that there was *no objective documentation* to support Dr. Gehring's diagnosis of radiculopathy, MetLife also ignored *its own internal notes* that stated "[o]n 11/03/03

Dr. Gehring completed APS noting diagnosis of Radiculopathy" and noted that

"**electrodiagnostic workups have been supplied supporting Dx of radiculopathy**." (AR at 72).

The Administrative Record also contains a December 17, 2003 Physician Consultant Review by Dr. Kevin Smith, a physician who examined Plaintiff on behalf of MetLife for the limited purpose of determining her ability to work at any occupation. (AR at 663). Notably, in reviewing Plaintiff's history, Dr. Smith noted that "[a]n MRI showed L5-S1 herniated disc to the right, **displacing the right S1 nerve root**."[5] (*Id*.)(emphasis added). That statement was also ignored by MetLife.

In addition, although MetLife had the ability to have a physician conduct an independent medical exam of Plaintiff, and review or repeat any of her test results, in order to determine if one of the enumerated exceptions existed, it chose not to do so, opting instead for a "file review." The Sixth Circuit has indicated that a plan administrator's decision to conduct a mere file review is another factor to consider in assessing whether a decision was arbitrary and capricious. *Calvert v. Firstar Finance, Inc*., 409 F.3d 286, 295 (6th Cir. 2005). In *Calvert*, the court stated that it found "nothing inherently objectionable about a *file review by a qualified physician* in the context of a benefits determination." *Id.* at 296 (emphasis added).

Here, however, rather than have a physician review Plaintiff's file for the initial benefits determination, or her appeal, MetLife elected to have a nurse review Plaintiff's file. Moreover, the Plan states "[i]f the initial denial is based in whole or in part on a medical judgment, MetLife

---

[5]The Plan defines the term "Radiculopathies" as "Disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology."

16

will consult with a health care professional with appropriate training and experience in the field

of medicine involved in the medical judgment."  (AR at 38); *see also* 29 C.F.R. § 2560.503-

1h(3)(ii).  MetLife's determination here undoubtedly was based in whole or in part on a "medical

judgment," given that: 1) Dr. Gehring gave Plaintiff a primary diagnosis of radiculopathy; 2) Dr.

Gehring's June 27, 2001, report noted that Plaintiff's MRI disclosed "displacement of the right

S1 nerve root"; and 3) MetLife's own internal notes stated that there were electrodiagnostic

workups supporting a diagnosis of radiculopathy.  Nevertheless, there is nothing in the record to

indicate that the nurses who reviewed Plaintiff's file had any specialized training or experience

with neuromusculoskeletal disorders or radiculopathies.

The Court therefore concludes that the file review here was clearly inadequate, this is

especially so given that in reaching the determination to deny benefits, MetLife ignored Dr.

Gehring's statement diagnosing Plaintiff with radiculopathy, ignored Dr. Gehring's June 27,

2001 report, and ignored its own file notes stating that electrodiagnostic workups supported a

diagnosis of radicuolopathy.[6]

In addition, as mentioned above, there is an apparent conflict of interest in this case

because MetLife had the dual function of deciding whether a claim is eligible for benefits and it

is responsible for paying such benefits.  *See Glenn, supra*.  The Court believes that this conflict

of interest further supports a finding that MetLife's decision to terminate Plaintiff's long-term

disability benefits is arbitrary and capricious upon the record before the Court.

---

[6]Although MetLife's July 8, 2004 and January 18, 2005 letters to Plaintiff did not take
such a position, in this action Metlife takes the position that Plaintiff was required to establish a
current diagnosis of radiculopathy at the time of her 24-month review in order to receive benefits
for more than 24 months.  The plain language of the Plan, however, sets forth no such
requirement.

17

For these reasons, the Court concludes that MetLife's decision to terminate Plaintiff's long-term disability benefits was arbitrary and capricious and therefore shall grant Plaintiff's motion to reverse the administrator's determination.

C.    Plaintiff Has Requested An Unspecified Attorney Fee Award.

The Court notes that Plaintiff has requested an award of attorney fees under ERISA. Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. §1132(g)(1).  In a case such as this one, the Sixth Circuit recognizes no presumption as to whether attorney fees will be awarded.  *Foltice v. Guardsman Products, Inc.*, 98 F.3d 933, 936 (6th Cir. 1996).  That is, the Sixth Circuit has rejected the proposition that a plan participant who wins an ERISA benefits action should ordinarily recover an attorney fee award unless special circumstances would render such an award unjust.  *Id.* When considering whether an attorney fee award is appropriate, district courts should consider the following five factors: 1) the degree of the opposing party's culpability or bad faith; 2) the opposing party's ability to satisfy an award of attorney's fees; 3) the deterrent effect of an award on other persons under similar circumstances; 4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and 5) the relative merits of the parties' positions. *Id.* at 936-37.

Here, while Plaintiff has requested an attorney fee award, Plaintiff has not specified the amount of attorney fees requested, or submitted documentation of the fees requested, and the parties have not briefed the issue.  Accordingly, the Court shall order the parties to brief the issue

18

so that the Court can consider the above factors and determine whether an attorney fee award is appropriate in this action.

### III.   CONCLUSION & ORDER

For the reasons set forth above, the Court concludes that MetLife's decision to terminate Plaintiff's long-term disability benefits was arbitrary and capricious.  The Court therefore GRANTS Plaintiff's motion to seeking to reverse the administrator's determination [Docket Entry No. 17], and hereby ORDERS  MetLife to reinstate Plaintiff's long-term disability benefits, retroactive to the date on which they were terminated, July 10, 2004.[7]

The Court directs counsel to confer in order to assist the parties and the Court to reach an agreement as to the amount of past benefits to be awarded consistent with this Opinion & Order. The status of the agreement shall be reported to the Court on October 6, 2006.

It is further ORDERED that Defendants' cross-motion, seeking to affirm the administrator's decision to terminate Plaintiff's benefits [Docket Entry No. 21], is DENIED.

It is further ORDERED that:

1)  By October 9, 2006, Plaintiff shall file a brief of no more than 10 pages in support of her request for attorney fees, attaching all documentation in support of her request;

2)  By October 16, 2006, Defendants shall file a brief of no more than 10 pages in response to Plaintiff's brief; and

3)  By October 23, 2006, Plaintiff shall file her reply brief, if any, of no more than 3 pages.

---

[7]*See Glenn, supra, at \*13; Kalish* v. Liberty Mutual, 419 F.3d 501 (6th Cir. 2005); *Williams v. Int'l Paper Co.*, 227 F.3d 706 (6th Cir. 2000).

19

A final Judgment will be entered by the Court once the amount of past benefits, and an

attorney fee award, if any,  has been agreed to by the parties or otherwise determined by the

Court.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge


Dated:  September 27, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on
September 27, 2006, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager